654 So.2d 292 (1995)
BELLSOUTH ADVERTISING AND PUBLISHING CORPORATION, Appellant,
v.
UNEMPLOYMENT APPEALS COMMISSION and Rrobert J. Stack, Appellees.
No. 94-365.
District Court of Appeal of Florida, Fifth District.
May 5, 1995.
T. Todd Pittenger of Lowndes, Drosdick, Doster, Kantor & Reed, P.A., Orlando, for appellant.
William T. Moore, Tallahassee, for appellee, Unemployment Appeals Com'n.
No Appearance, for appellee, Robert J. Stack.
GRIFFIN, Judge.
This is an appeal by Bellsouth Advertising and Publishing Corporation ["BAPCO"] from an order of the Unemployment Appeals Commission, awarding unemployment benefits to a former employee, Robert Stack.
Stack had been employed by BAPCO since 1980 as a manager at a salary of $68,000 per year. He was the supervisor of ten or more sales representatives and support staff. His employment as a manager was terminated on March 12, 1993 and he filed a claim for unemployment compensation. BAPCO objected to payment of benefits on the ground that he had been discharged for misconduct. *293 A hearing was commenced before an appeals referee on August 16, 1993 and completed on September 16, 1993.
At the first hearing, Nancy Dowdy Siegman, the Human Resources Representative for BAPCO, testified that a "combination of instances" led to Stack's dismissal.[1] Complaints had been received from at least two employees about Stack's sexist or racist conduct in the workplace. The first information came from an exit interview with a female employee in December 1992. The second complaint came in February 1993 from Fred Goldberg, a male employee under Stack's supervision. Ms. Siegman interviewed Stack about the complaints on March 5, 1993. At that time, Stack admitted to calling Goldberg "a little Jew boy." However, Stack claimed that nothing derogatory was meant by it and that Goldberg referred to himself as a "little Jewish boy." Stack denied making any comments of a sexual or racial nature but he acknowledged putting women's lingerie ads on another sales representative's desk. He admitted he called some of his sales representatives, including Goldberg, "weasel dick" in office meetings.[2] He also acknowledged he made "kidding around" comments to one homosexual employee.
Ms. Siegman conducted an investigation of Stack's conduct and uncovered, in addition to the foregoing, which Stack admitted, allegations of numerous other gross and offensive behaviors in the workplace.[3] She recorded these statements in a report entitled "Daytona Beach Sales Office Complaint Bob Stack," which she delivered to her supervisor. When the report was offered in evidence, the only objection from Stack was that he had not previously seen it. The referee accepted it, telling Stack he would give him ample time to comment on it.
In his written order, the appeals referee concluded that BAPCO failed to show that Stack was guilty of misconduct connected with his work because neither of the two witnesses who actually testified, Siegman and Charles Walsh, Siegman's supervisor, had first-hand knowledge of the incidents. He rejected the Siegman report as hearsay and ruled that "the only competent evidence presented by the employer" consisted of Stack's own admission that he had called an employee a "little Jew boy." Based on this limited evidence, he found that Stack had not made the statements he did not admit to making and the ones he did admit to evinced no more than "poor judgement." We reverse and remand for a new hearing.
BAPCO urges that, whether or not Siegman's report was admissible, the conduct admitted to by Stack rises to the level of misconduct, as a matter of law. Stack was a management level employee entrusted with supervisory power over several company employees. His behavior was egregious enough that employees under his supervision took the risk of complaining about it to the employer. Stack's job was to prevent this sort of behavior in the workplace, not to exemplify it. This kind of conduct in the workplace has not only legal but economic consequences for the employer, especially if perpetrated by a supervisor. Smallzman v. Sea Breeze, Inc., 1993 WL 15904, 63 Empl.Prac.Dec. p. 42,859 (D.Md. Jan. 7, 1993); see also Steiner v. Showboat Operating Co., 25 F.3d 1459 (9th Cir.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995). Having been put on notice of the behavior Stack admitted to, BAPCO was clearly obliged to take action to protect the employees who *294 were being subjected to it. Yet, the referee did not deem it to be "misconduct."
"`Misconduct" is defined by Section 443.036(26), Florida Statutes (1991) as follows:
MISCONDUCT.  "Misconduct" includes, but is not limited to, the following, which shall not be construed in pari materia with each other:
(a) conduct evincing such willful or wanton disregard of an employer's interests as is found in deliberate violation or disregard of standards of behavior which the employer has the right to expect of his employee; or
(b) Carelessness or negligence of such a degree or recurrence as to manifest culpability, wrongful intent, or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. (Emphasis added).
Although we do not reverse on this basis, whether Stack's admitted conduct meets the definition of "misconduct" is, at best, a close question.
BAPCO also urges that Stack's admissions, when buttressed by Siegman's report, require a finding of misconduct. The hearing officer manifestly treated the Siegman report as if it had no evidentiary value because its hearsay nature would not allow it to be sufficient in itself to support a finding of misconduct. This was error and requires a new hearing at which the hearsay is given weight as useable evidence. Section 120.58(1)(a), Florida Statutes provides:
Agency action; evidence, record and subpoenas. 
(1) In agency proceedings for a rule or order:
(a) Irrelevant, immaterial, or unduly repetitious evidence shall be excluded, but all other evidence of a type commonly relied upon by reasonably prudent persons in the conduct of their affairs shall be admissible, whether or not such evidence would be admissible in a trial in the courts of Florida. Any part of the evidence may be received in written form, and all testimony of parties and witnesses shall be made under oath. Hearsay evidence may be used for the purpose of supplementing or explaining other evidence, but it shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions. This paragraph applies only to proceedings under s. 120.57.
Thus, hearsay is admissible to supplement or explain admissible evidence.[4] In this case, there was some admissible evidence of misconduct. Stack attempted to minimize his admitted behavior by making explanations that ranged from the incoherent ("Everybody" uses "weasel dick" to refer to people "having a bad day") to the insubstantial (If Goldberg calls himself "Jew boy," I can too; "I thought `Jew boy' was a reference to nationality, not race or ethnicity;" I was "just joking.") The investigative report of Ms. Siegman was admissible to buttress the non-hearsay evidence of misconduct and, accordingly, to discredit Stack's explanations and excuses for his conduct. See Silvia v. Cumberland Farms, Inc., 588 So.2d 1069, 1071 (Fla. 4th DCA 1991). What emerges overall is a pattern of conduct that seems ill described, as was done by the referee, as "merely using poor judgment in allowing these phrases to be used in the office."[5]See Sears, Roebuck & Co. v. Florida Unemployment Appeals Comm'n, 463 So.2d 465 (Fla. 2d DCA 1985). The report further indicates that Stack's admitted behavior was not an innocent or isolated slip of phrase in the hurley-burley of the workplace but a pattern of deliberate disregard of standards of behavior which the employer had the right to expect, and of indifference to BAPCO's exposure to liability for his conduct.
BAPCO's final contention on appeal, that Siegman's investigative report was admissible as a business record under the business records exception to the hearsay rule is *295 wrong. § 90.803(6), Fla. Stat. (1993). See Harris v. Game & Fresh Water Fish Comm'n, 495 So.2d 806 (Fla. 1st DCA 1986). The referee correctly concluded in his final order that the report was hearsay.[6] BAPCO should have called its employees to testify directly about Stack's conduct.
Finally, although not the basis for our reversal since it was not raised as an appellate issue, the most bizarre aspect of this proceeding, and the underlying reason for this appeal, is that when Siegman's report was offered by BAPCO, there was no objection to its admissibility; the referee gave no hint that he considered the document inadmissible hearsay or that BAPCO had failed to establish the necessary predicate for use of hearsay under section 120.58(1)(a), Florida Statutes. The report was accepted with no reference at all to any possible evidentiary infirmities. It was only when the referee rendered his decision that it was rejected on hearsay grounds. This seemingly odd procedure is evidently a recognized, if widely criticized, principle of review of administrative decisionmaking that goes by the name of the "residuum rule." In Florida, the residuum rule is statutory. § 120.58(1)(a), Fla. Stat. (1993).
The basic residuum rule seems to go this way: even though all evidence may be "admissible" in an administrative context (hence no objection is necessary), the fact finder's ruling must be grounded in a "residuum" of evidence that would be admissible in a jury trial. See generally, J. Lawrence Johnston, Admissibility and Use of Evidence in Formal Administrative Proceedings: An Alternative Possibility for Change, 65 Fla.B.J. 63 (March, 1991). Even though there may have been no objection, indeed no mention of the inadmissibility of evidence, the hearing officer is bound to decide the case by sifting through the evidence to find a residuum of satisfactory admissible evidence. The residuum rule has now been rejected in most jurisdictions and most commentators are highly critical of it. Id. at 65. "[I]t has been severely criticized by scholars and its application has strained judicial reasoning." 2 McCormick on Evidence § 354 at 522 (4th ed. 1992).
Among those most critical of residuum rules is Kenneth Culp Davis. In his Administrative Law Treatise,[7] he makes the following observation:
As soon as the residuum rule and the alternative to the rule are understood, the reasons against the rule become overwhelming  so overwhelming as to give rise to the question whether courts that have given lip service to the residuum rule have done so on the basis of misunderstanding instead of through an exercise of informed judgment.
Possibly the main question that needs full exploration is this: In a nonjury trial in court or agency, what are the costs and benefits of each of two practices  (1) deciding all contested questions of admission or exclusion at the time evidence is offered, or (2) admitting all the evidence that is apparently relevant and material (except for privileges based on substantive policy) and leaving all other questions related to admissibility for determination when the evidence is evaluated for making findings?
* * * * * *
Some subordinate questions that need to be answered on the basis of full investigation and study are these: How much longer are records when all apparently relevant and material evidence is admitted? What harms result other than increased cost of transcripts? Is preparation of counsel more difficult, or does removal of uncertainty about admissibility make preparation easier? Is factfinding more difficult or less difficult? How great is the saving from the reduced number of evidence *296 questions that reach appellate courts? Can the question be answered whether findings are more accurate or less accurate; if not, can an informed judgment be made on that question? Can any comparison be made of the frequency of misleading factfinders by admitting incompetent evidence with the frequency of misleading factfinders by excluding relevant evidence? To what extent if at all does reception of incompetent evidence reduce presentation of competent evidence?
Concerns such as those expressed by Professor Davis probably explain why there appears to be a conflict within the First District Court of Appeal concerning whether unobjected to hearsay is sufficient to support a finding in an administrative proceeding. Charles W. Ehrhardt, Florida Evidence, § 103.2 at 5 (1994), citing Tri-State Systems, Inc. v. Department of Transp., 500 So.2d 212 (Fla. 1st DCA 1986), review denied, 506 So.2d 1041 (Fla. 1987), and Harris, supra. Neither Tri-State or Harris references the "residuum rule" by name; however, Harris is a classic application of it, whereas Tri-State is a reaction to its illogic. The extremity of the application of this rule can be seen in Scott v. Department of Professional Regulation, 603 So.2d 519, 520 (Fla. 1st DCA 1992). There the licensee not only did not object to the hearsay character of the evidence offered in her license suspension hearing, she did not even appear. Yet, the court reversed on the legal insufficiency of the evidence because the unobjected to (hearsay) report offered as evidence was incompetent.
Section 120.58(1)(a) has two interesting features. The provision equivalent to the residuum rule allows for the "use" of hearsay only to supplement or explain other evidence that would be admissible in a civil action over objection. The provenance of Florida's version is unknown to us; we have not come across another state with a version quite like it. Although under 120.58(1)(a), until there is something in the record for hearsay to supplement or explain, it has no "use," Florida courts do not require the party to object nor the hearing officer to make a ruling when the evidence is offered. This may be highly convenient for hearing officers, agencies and respondents but it is certainly inefficient and probably unfair to whomever bears the burden of proof.
An interesting feature of section 120.58(1)(a) is that it requires that irrelevant evidence be excluded, which appears to represent a deviation from the classic view that all evidence is admissible. 2 McCormick on Evidence § 352 at 512 n. 1 and accompanying text. Logically, as in this case, either the hearsay should have been admitted because the predicate for its use had been met, or it should have been excluded until it had a use  i.e. to supplement or explain other admissible evidence of misconduct. Harris and Scott deal with the problem that arises when the hearing officer fails to apply section 120.58 and, thus, uses hearsay evidence in reaching his findings. This case, on the other hand, deals with the decision of the hearing officer not to use hearsay. Consistent with the language of our statute and the problems identified by Professor Davis, it seems preferable that the hearing officer should not receive "useless" evidence. Until a predicate for admission of otherwise inadmissible hearsay is established, it has no use and should not be received. Otherwise, the proponent has no way of getting a ruling at a meaningful time whether the evidence is hearsay or whether the predicate for admitting it has been met. Worse, the result of applying the residuum rule as was done in Harris, Scott and in this case is to create the "trap for the unwary" McCormick warns about. McCormick, § 354 at 522.[8] If a procedure is followed whereby the determination about the utility (or "useability") of evidence is made during the hearing, the parties can better prepare their presentations of evidence, the proponent of the evidence is not lulled into failing to offer other evidence, fact-finding is facilitated and ex post facto surprises such as those that occurred in Harris and in this case are eliminated.
*297 In light of Florida's statutory limitations on the use of hearsay in administrative proceedings, it does not make sense that a litigant should have to pile up his evidence before an inscrutable referee or hearing officer as though making an offering to a silent and possibly angry god, not knowing what is deemed hearsay or not hearsay, not knowing what "might" be deemed admissible over objection, depending on whether it is determined there is evidence for it to supplement or explain  until the hearing officer issues his or her final order. By then, it is too late. If rejection of hearsay based on section 120.58(1)(a) is going to occur at the hearing level, it should be done at the moment it is offered  as if offered in a trial over objection. If the referee had made a ruling on the hearsay offered in this case at the appropriate time, BAPCO may have been able to remedy the defect in its proof when the hearing was continued. In an evidentiary proceeding, it is unfair to a party who offers evidence to have it received by the fact finder without objection from the adversary or without any limitation by the fact finder only to discover later that its evidence was secretly rejected. This could all be avoided simply by requiring the hearing officer to determine these issues before the evidence is closed.
REVERSED and REMANDED.
W. SHARP, J., concurs.
HARRIS, C.J., dissents, with opinion.
HARRIS, Chief Judge, dissenting.
I respectfully dissent.
There is a danger that this dissent will be read as condoning the inexcusable conduct depicted by the hearsay investigative report so graphically described in the majority opinion. But it is not my intent to defend the character of a person I do not know; my intent is to support a decision made by an impartial hearing officer (and affirmed by the Unemployment Appeals Commission) based on the law and the record before us.
I submit that it was within the province of the hearing officer to determine what statements were made by Stack and whether the statements so proved were so gross or constituted an act so willfully contrary to his employer's best interest that the denial of unemployment compensation would be appropriate under the law. Because the record supports the hearing officer's decision, I will not substitute my opinion for his.[1]
Judge Griffin justifies this reversal on the basis that the referee treated the investigative report, admittedly hearsay, "as having no evidentiary value." It is her contention that since section 120.58(1)(a), Florida Statutes permits hearsay evidence to be used to supplement or explain other evidence, "[t]he investigative report of Ms. Siegman was admissible to buttress the non-hearsay evidence of misconduct and, accordingly, to discredit Stack's explanations and excuses for his conduct."
This reasoning ignores two facts. First, the only non-hearsay statements of misconduct came from Stack and the hearing officer accepted these statements, harmful to Stack, as true but held such statements insufficient to deny employment compensation. Second, the hearing officer did consider the investigative report and found its hearsay statements unworthy of belief and thus unworthy of supplementing or explaining anything. The fact that the hearing officer considered and rejected the investigative report is evident from his finding:
Many employees complained that the claimant made inappropriate comments of a gender, religious or racial nature. Except for referring to one employee as a little jew boy, and joking with one employee about homosexuals, the claimant made no such statements. (Emphasis added).
Since Stack denied under oath making the statements attributed to him in the investigative report, the hearing officer's finding that Stack did not make such statements is supported by the record. Merely, because the *298 majority herein would have accepted the hearsay statements as true does not justify reversal. Believability of testimony (even hearsay for the purpose of supplementing or explaining other evidence) is the function of the hearing officer and not this court.
The hearing office ruled that the employer, having been given an opportunity to do so, simply failed to prove its case. This record does not support giving the employer a second chance.
NOTES
[1] Stack's supervisor also testified for BAPCO about the circumstances leading to Stack's dismissal.
[2] Stack explained the term "weasel-dick" was a term used by sales representatives and other managers if a person was having a "rough day": "It was just a term that was used and nothing unusual."
[3] Examples of Stack's conduct recorded in the report include references to another representative as "nigger," or "fucking nigger" and references to a female sales representative's chest. ("Look at [the] tits on her," "big boobs," "stared at her chest with smirk on his face".) The comments he reportedly made to, or about, homosexual employees are of a similar ilk. It was also reported that Stack made comments to another female sales representative about being ugly and complained they did not have "good looking" sales representatives. According to some sales representatives, Stack spoke in a rude and condescending way, and often used obscenities in referring to their customers.
[4] In his dissent, Judge Harris argues that the hearing officer did not err in failing to advise BAPCO's counsel that the report was deemed inadmissible since it was admissible for its value as "supplemental proof." The referee's decision is clear, however, that he treated it as having no evidentiary value.
[5] Emphasis supplied.
[6] The cases principally relied on by BAPCO, most notably, Department of General Services v. English, 509 So.2d 1198 (Fla. 1st DCA 1987) are inapplicable. There, the documents offered to prove employee misconduct were records kept in the ordinary course of business and were generated contemporaneously with the events. In this case, certain documents, such as the exit interview with the departing employee, would have fallen within the purview of English and the business record exception but, for some reason, this document was not offered.
[7] Kenneth Culp Davis, 3 Administrative Law Treatise, § 16.6 at 239 (2d ed. 1980).
[8] McCormick also argues the residuum rule encourages hearing officers to exclude hearsay in order to avoid possible error. Id.
[1] It should be noted that the record shows that Stack was not discharged because of the conduct admitted by him. It was because of all of his conduct revealed by the investigative report that contained additional, and even more harmful, information. The right (even the obligation) of the employer to fire Stack is not the issue before us. It is whether the employer presented adequate admissible evidence to deny unemployment benefits.